[Cite as *In re S.M.B.*, 2019-Ohio-3578.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the Matter of:             :

                                         No. 17AP-899
S.M.B.                         :         (C.P.C. No. 14JU-5674)

        (Defendant-Appellant).    :         (REGULAR CALENDAR)

─────────────────────

D E C I S I O N

Rendered on September 5, 2019

─────────────────────

**On brief:** *Yeura R. Venters*, Public Defender, and *Timothy E. Pierce*, for appellant. **Argued:** *Timothy E. Pierce*.

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie Swanson*, for appellee. **Argued:** *Valerie Swanson*.

─────────────────────

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

SADLER, J.

{¶ 1} Defendant-appellant, S.M.B., appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, adjudicating him a delinquent minor for committing rape and gross sexual imposition. For the foregoing reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} This case arose from a complaint filed by plaintiff-appellee, State of Ohio, on April 29, 2014, alleging that minor child, S.M.B., was delinquent due to the offenses of gross sexual imposition, in violation of R.C. 2907.05, on a child, T.R., age ten; rape, in violation of R.C. 2907.02, on a child, M.P., age six; and gross sexual imposition, in violation of R.C. 2907.05, on a child, K.M., age three. Count 1 of the complaint alleges S.M.B. "did grab the breasts of [T.R.] under her bra, after throwing items down her shirt and then retrieving them. [S.M.B.] also grabbed the vaginal area outside of clothing of [T.R.] when she stood

to leave the room.  [T.R.] is 10 years old."  (Apr. 29, 2014 Compl. at 1.)  Count 2 of the complaint alleges S.M.B. "did use his hand to touch [M.P.] in the genital area under her clothing as well as have [M.P.] 'suck his privates like a popsicle.' * * * [M.P.] being 5 years of age.  (Apr. 29, 2014 Compl. at 1.)  Count 3 alleges that S.M.B. "did touch the penis of [K.M.].  [K.M.] is 3 years old."  (Apr. 29, 2014 Compl. at 2.)  Based on S.M.B.'s birth date, June 18, 1999, he was 14 years old when he allegedly committed the offenses charged in the complaint.

{¶ 3}  On April 30, 2015, S.M.B., by and through his parents, J.B. and B.B., denied the allegations in the complaint.  On several days in July and August 2015, a juvenile court magistrate held an adjudicatory hearing on the complaint.  On September 1, 2015, the magistrate issued a decision, including findings of fact and conclusions of law, wherein the magistrate found the state had proven the allegation of rape as to victim M.P., beyond a reasonable doubt, and the allegation of gross sexual imposition as to victim K.M., beyond a reasonable doubt.  The magistrate found the state had failed to prove the allegation of gross sexual imposition as to victim T.R. and recommended dismissal of Count 1 of the delinquency complaint.  Accordingly, the magistrate adjudicated S.M.B. to be a delinquent minor for having committed the offense of rape, as alleged in Count 2 of the complaint, and the offense of gross sexual imposition, as alleged in Count 3 of the complaint.

{¶ 4}  On December 1, 2015, S.M.B., by and through legal counsel, filed an objection to the magistrate's decision wherein S.M.B. challenged "rulings on evidentiary issues and the underlying conclusions of the Magistrate" and claimed "the adjudication by the Magistrate was flawed and not substantiated by the evidence presented."  (Dec. 1, 2015 Obj. at 2.)  On June 27, 2016, S.M.B. filed the transcript of evidence presented to the magistrate in support of his objection.  On October 17, 2016, S.M.B. filed supplemental objections to the magistrate's decision.  The supplemental objections included specific challenges to the magistrate's competency determination and certain evidentiary rulings, as well as a claim that the evidence did not support the magistrate's finding that S.M.B. committed the offenses of rape and gross sexual imposition.

{¶ 5}  On November 9, 2016, the juvenile court issued a decision and entry overruling the objections and adjudicating S.M.B. delinquent for committing the offenses

of rape and gross sexual imposition. S.M.B. timely appealed to this court from the judgment of the juvenile court.

## II.  ASSIGNMENTS OF ERROR

{¶ 6}  S.M.B. assigns the following as trial court error:

[1.]  The lower court erred when it allowed [M.P.] to testify when she was not a competent witness. The admission of [M.P.'s] testimony violated Evid.R. 601(A) and R.C. 2317.01 and [S.M.B.'s] right to a fair trial under Article I, Sections 1, 10, and 16 of the Ohio Constitution and the Sixth and Fourteenth Amendments of the United States Constitution.

[2.]  The lower court erred when it permitted prosecution witness [M.P.] to testify without her having been administered an oath or affirmation declaring she would do so truthfully with an understanding of the penalties for not testifying truthfully. This violated [S.M.B.'s] rights under Article I, Sections 7 and 10 of the Ohio Constitution, the Sixth and Fourteenth Amendments of the United States Constitution, R.C. 3.21, R.C. 2317.30, R.C. 2945.46, Juv.R. 29(E)(3), and Evid.R. 603.

[3.]  The lower court erred when it admitted the statements of [M.P.] and [K.M.] to [C.P.] and [M.M.] (respectively) as hearsay exceptions under Evid.R. 803(2). This violated Evid.R. 802 and [S.M.B.'s] right to a fair trial under Article I, Sections 1, 10, and 16 of the Ohio Constitution and the Sixth and Fourteenth Amendments of the United States Constitution.

[4.]  The lower court committed plain error when it admitted during trial the statements of incompetent declarants [K.M.] and [M.P.]. This violated Evid.R. 103(D) and 802 and [S.M.B.'s] right to a fair trial under Article I, Sections 1, 10, and 16 of the Ohio Constitution and the Sixth and Fourteenth Amendments of the United States Constitution.

[5.]  The lower court erred in finding [S.M.B.] delinquent inasmuch as its verdicts were against the manifest weight of the evidence.

## III.  STANDARD OF REVIEW

{¶ 7}  Civ.R. 53 governs proceedings before a magistrate, including objections to a magistrate's decision. *AM & JV, LLC v. MyFlori, LLC*, 10th Dist. No. 16AP-713, 2018-Ohio-600, ¶ 18. In ruling on objections to a magistrate's decision, the trial court must undertake an independent review of the matters objected to in order to ascertain whether the

magistrate has properly determined the factual issues and appropriately applied the law. *Id.,* citing Civ.R. 53(D)(4)(d).   In accordance with Civ.R. 53, a trial court reviews a magistrate's decision de novo.  *Id.,* citing *James v. My Cute Car, LLC*, 10th Dist. No. 16AP-603, 2017-Ohio-1291, ¶ 13.  The standard of review on appeal from a trial court judgment that adopts a magistrate's decision varies with the nature of the issues that were (1) preserved for review through objections before the trial court and (2) raised on appeal by assignment of error.  *AM & JV* at ¶ 18, citing *In re Guardianship of Schwarzbach*, 10th Dist. No. 16AP-670, 2017-Ohio-7299, ¶ 14.

## IV.  LEGAL ANALYSIS

{¶ 8}   Because our resolution of S.M.B.'s fifth assignment of error requires us to set out the factual foundation necessary for our analysis of his remaining assignments of error, we will begin our analysis with that assignment of error.

### A.  S.M.B.'s Fifth Assignment of Error

{¶ 9}   In S.M.B.'s fifth assignment of error, S.M.B. argues the adjudication of delinquency was against the manifest weight of the evidence.  We disagree.

{¶ 10} *In re M.T.,* 10th Dist. No. 05AP-816, 2006-Ohio-3613, "set[s] forth the standard of review when a juvenile delinquency adjudication is challenged on manifest weight grounds."  *In re A.W.*, 10th Dist. No. 09AP-312, 2009-Ohio-5093, ¶ 4.  The standard is as follows:

> A challenge to the manifest weight of the evidence attacks the credibility of the evidence presented.  The court of appeals sits as a "thirteenth juror" and after reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
>
> A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial.  The determination of weight and credibility of the evidence is for the trier of fact.  The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is

credible. The trier of fact is free to believe or disbelieve all or any of the testimony. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the fact finder's determination of the witnesses' credibility. (Citations omitted.) *In re M.T.* at ¶ 8-9.

*Id.*

{¶ 11} With respect to victim M.P., the juvenile court found S.M.B. delinquent for committing rape, in violation of R.C. 2907.02(A)(1)(b), which provides, in relevant part, that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." The definition of "sexual conduct" includes "fellatio * * * and * * * the insertion, however slight, of any part of the body * * * into the vaginal or anal opening." R.C. 2907.01(A).

{¶ 12} With regard to victim K.M., the juvenile court found S.M.B. delinquent for committing gross sexual imposition, in violation of R.C. 2907.05(A)(4), which provides, in relevant part, that "[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." " 'Sexual contact' means any touching of an erogenous zone of another, including * * * genitals * * * for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

### 1. Victim M.P.

{¶ 13} The testimony at trial regarding the sexual abuse of victim M.P. was as follows: M.P. testified that J.B. was her babysitter. When the prosecutor asked M.P. if something happened to her body, she responded "[y]es," and she added it "[f]elt weird." (July 16, 2015 Tr. at 14.) When the prosecuting attorney asked a follow up question, the following exchange took place:

Q. You said it felt weird and then you did something; show us what you did. Okay.

ASSISTANT PROSECUTING ATTORNEY JULIAN: May the record reflect that she's pointing to her vaginal area?

ATTORNEY LISTON: Well she's making an up and down motion in front of her waist.

MAGISTRATE VAN DYKE: And that I will agree to. That's what the record will reflect, at this point.

* * *

Q. [Y]ou said it felt weird, and you pointed to an area on your body; what happened?

A. He touched my private parts.

Q. Who did?

A. [S.M.B.]

(July 16, 2015 Tr. at 15-16.)

{¶ 14} M.P. was able to make an in-court identification of S.M.B. as the person who had "touched [her] private parts" with "[h]is hands." (July 16, 2015 Tr. at 17.) She also testified: "He made me suck on his thingy." (July 16, 2015 Tr. at 17.) M.P. stated that S.M.B. did this "one time." (July 16, 2015 Tr. at 19.)[1] M.P. testified that she told her mother about this and that her mother took her to see the doctor. M.P. further stated that she told the doctor what happened and she also "told a cop." (July 16, 2015 Tr. at 20.)

{¶ 15} M.P.'s mother, C.P., testified that in 2014, S.M.B.'s mother, J.B., ran a daycare center out of her home and that she used J.B.'s services to care for M.P. C.P. testified that on April 17, 2014, she and M.P. were watching the film "Frozen" when M.P. kept saying to her "I'm not supposed to say anything." (July 16, 2015 Tr. at 51, 52.) According to C.P., M.P. was calm initially but then she got nervous. Defense counsel objected, and the judge provisionally allowed C.P. to testify about M.P.'s out-of-court statements under the excited utterances exception to the hearsay rule.

{¶ 16} C.P. testified that M.P. told her: "[S.M.B.] has secrets." (July 16, 2015 Tr. at 53.) When C.P. asked M.P. what she meant, M.P. responded she "wasn't supposed to tell." (July 16, 2015 Tr. at 52-53.) C.P. testified that she told her daughter: "you don't keep secrets from mommy. You tell mommy." (July 16, 2015 Tr. at 53.) C.P. testified that M.P. then told her "[S.M.B.] touches her butt." (July 16, 2015 Tr. at 54.) According to C.P., M.P. uses the word "butt" when referring either to her vagina and her anus. (July 16, 2015 Tr. at 54.) M.P. pointed between her legs when C.P. asked her where on her body S.M.B. touched her.

---

[1] The record shows M.P. was asked to repeat this testimony several times because either the magistrate or S.M.B.'s trial counsel stated they could not hear M.P.'s answer. She was able to do so.

When C.P. asked M.P. if her clothes were on or off when S.M.B. touched her butt, M.P. stated that her clothes were off.

{¶ 17} On hearing her daughter's revelation, C.P. phoned her sister and then made the decision to take M.P. to Nationwide Children's Hospital ("Children's"). During her trial testimony, C.P. recalled that "maybe a month or two before" M.P. disclosed the sexual abuse, M.P. was having "a lot of difficulty sleeping. * * * She was soiling her pants; having accidents when she didn't really do that. She was more clingy. She would cry." (July 16, 2015 Tr. at 73, 74.)

{¶ 18} Toni Soltes works in Children's emergency room as a medical social worker. Soltes testified that on April 17, 2014, she was working the triage desk when she was contacted about alleged sexual abuse concerning M.P. Soltes conducted an interview of M.P., at which time M.P. disclosed something had happened at her babysitter's house. M.P. told Soltes that "[S.M.B.] had touched her butt with his dirty hands." (July 17, 2015 Tr. at 38.) With the aid of an anatomical drawing, Soltes encouraged M.P. to show her the part of her body S.M.B. touched. According to Soltes, M.P. identified her vagina as her "butt," and she told Soltes that this happened in front of K.M. and another child. (July 17, 2015 Tr. at 46.) Soltes' notes from the interview state that "[M.P.] did tell me [S.M.B.] touches her butt * * * with his dirty hands under her clothes in the hallway." (July 17, 2015 Tr. at 73.) M.P. also told Soltes that S.M.B. "had taken her into his mother's room where he would ask me to suck on his private like a popsicle." (July 17, 2015 Tr. at 48.)

{¶ 19} According to Soltes, M.P. stated this behavior by S.M.B. occurred "a lot" of times. (July 17, 2015 Tr. at 89.) M.P. further disclosed that S.M.B. "took pictures of her two or three times" and "he had told her not to tell." (July 17, 2015 Tr. at 49.) After talking with M.P., Soltes recommended that M.P. be linked with a therapist for trauma-related treatment.

{¶ 20} Julia Lloyd, M.D., testified that she was the attending physician in the emergency room at Children's on the night M.P. was brought in. She testified that prior to conducting a physical examination of M.P., she was informed that M.P. "disclosed that the alleged perpetrator had requested oral sex from [her] patient and * * * had put his finger inside her vagina." (July 20, 2015 Tr. at 119.) According to Dr. Lloyd, M.P.'s medical

examination was essentially normal, but she cautioned that a normal examination result does not rule out sexual abuse.

### 2. Victim K.M.

{¶ 21} K.M.'s mother, M.M., testified J.B. was K.M.'s former babysitter. According to M.M., sometime in April 2014, K.M. "seemed apprehensive and scared" at dinner. (July 22, 2015 Tr. at 12.) She stated K.M. was just three years old at the time, a few weeks short of his fourth birthday. Over S.M.B.'s objection, M.M. testified that K.M. said "[S.M.B.] played with my penis and I didn't like it, and it hurt." (July 22, 2015 Tr. at 13.) M.M. recalled that her fiancé, her daughter, and one other person were there when K.M. made the statement. When asked about her reaction to K.M.'s statement, M.M. testified: "I was in utter shock, as was everyone at the table and I tried – I asked him what happened, and he said the exact same thing and I said, 'Are you sure?' and he said, 'Yes.' " (July 22, 2015 Tr. at 14.) M.M. testified that K.M. was taught to "use anatomically correct names" for body parts, and when K.M. refers to his penis he is referring to "[h]is genitals." (July 22, 2015 Tr. at 14.)

{¶ 22} M.M. stated that the next morning she told J.B. about K.M.'s disclosure and that J.B. told her "[i]t's just not possible. It couldn't happen. It didn't happen." (July 22, 2015 Tr. at 16.) C.P. stated that she left K.M. in the care of J.B. for approximately three more weeks, but when she learned of the other allegations of sexual abuse, she took K.M. to Children's to be examined.

{¶ 23} Kerri Wilkinson works at Children's as a forensic interviewer. When asked what she would expect a child of K.M.'s age to be able to relate, she answered: "I expect a three-year-old child to be able to tell a who, a what. The concept of time for a three or four-year-old; you wouldn't expect them to be able to tell you, you know, before or after or when something happened. They're just not developmentally able to do that. You may be able to get a where something happened but you can usually get a who and a what happened." (July 22, 2015 Tr. at 81.)

{¶ 24} A videotape of Wilkinson's interview with K.M. was played for the magistrate over S.M.B.'s objection. During the interview, K.M. told Wilkinson that he was three, he knew he was a boy, he lived with his mom, his sister F.M., and K., who he referred to as his daddy. Wilkinson showed K.M. an anatomical drawing and K.M. identified the penis as a

private part. When Wilkinson asked K.M. if someone ever touched his private parts, he said that his mom and his daddy touch it when he is in the bath, and his sister "tickles it when they're in the bath together." (July 22, 2015 Tr. at 78.) When Wilkinson asked K.M. if anyone else had touched his penis, he answered "[n]o." (July 22, 2015 Tr. at 106.)

{¶ 25} The interview then proceeded as follows:

> MS. WILKINSON: * * * I heard something about [S.M.B.]? I heard something happened with [S.M.B.].
>
> [K.M.]: He played with my penis. [S.M.B.] did.
>
> MS. WILKINSON: Oh. He played with your penis? Okay, tell me all about [S.M.B.] playing with your penis.
>
> [K.M.]: He got a tissue and—he got a tissue and he wiped it.
>
> MS. WILKINSON: He got a tissue and wiped it?
>
> [K.M.]: Uh-huh (affirmative response).
>
> MS. WILKINSON: Okay. And then what happened after he got a tissue and wiped it?
>
> [K.M.]: He (inaudible) and then he got out of [S.M.B.]'s room.
>
> MS. WILKINSON: Okay.
>
> [K.M.]: And then he — he leaved (sic).

(July 22, 2015 Tr. at 107-08.)

{¶ 26} K.M. stated that the events he described happened in S.M.B.'s room where he had been sleeping and that J.B. and another boy J.B. was caring for were in the living room. K.M. told Wilkinson "[S.M.B.] taked (sic) off my pants and—and my underwear. * * * Then he shutted (sic) the door and he went (inaudible) * * * and then I got up." (July 22, 2015 Tr. at 111.) When Wilkinson asked K.M. how it felt when S.M.B. was touching him, K.M. responded that "[i]t tickled my penis." (July 22, 2015 Tr. at 112.)

{¶ 27} On cross-examination, Wilkinson acknowledged that in conducting forensic interviews of suspected child sexual abuse victims she is expected to conform to protocols issued by the Center for Family Safety and the Healing Child Assessment Center ("CAC"), with the goal of minimizing interviewer influence. Wilkinson acknowledged the protocols require the interviewer to remain neutral and to focus on factfinding, without suggesting answers.

### 3. S.M.B.'s Witnesses

{¶ 28} S.M.B. offered his own testimony in an effort to establish he was not at home with the children for a length of time sufficient to commit the crimes in question. S.M.B. testified that on or about the time period of the alleged sexual abuse, he was a freshman in high school and living with his mother, J.B., his father, B.B., and his two dogs. He testified prior to his freshman year, he was involved in the high school band camp and the band camp started around 8:30 a.m. and did not end until after 5:00 p.m. He stated that he woke at 6:00 a.m. on a typical school day and got a ride to school either from a friend's father or one of his grandparents at around 7:00 a.m. He testified he never missed a day of school that year due to illness and that on scheduled days where school was not in session, he was either at his grandparents' home or his aunt's. According to S.M.B., though the school day ended at 2:30, he attended after school band activities each day, and he performed with the band on Friday evenings during football games. He stated that after football season ended, he became involved in the bowling team, Monday through Friday. During bowling season, S.M.B. would get a ride home from school at 2:30 p.m., grab his bowling equipment, and leave for the bowling alley. In addition to band and bowling, S.M.B. was also involved in Taekwondo, which he participated in Monday, Wednesday, and Friday.

{¶ 29} S.M.B., however, acknowledged that the children his mother was watching were at the house when he got home from school on days when he did not have an activity immediately after the school day. He stated the children were either sleeping or playing in the living room. He stated if a child was sleeping in his room, he was not allowed in. S.M.B. testified he had no responsibilities related to his mother's daycare operation, he never watched the children for his mother, and never played with any of the children. He stated there was never a time when his mother left him in the house alone with the children.

{¶ 30} S.M.B. denied the allegations made by M.P. He did recall nudging M.P. out of the way with his foot on one occasion when she would not move from the entry to the hallway. S.M.B. also denied the allegations made by K.M. in the videotaped interview with Wilkinson, and he denied ever being alone with K.M. He did acknowledge tripping over K.M. one day when K.M. was sleeping on the floor and that his foot struck the lower half of K.M.'s body. According to S.M.B., the incident with K.M. occurred just a few weeks before the allegations of sexual abuse were made against him.

{¶ 31} S.M.B. also called J.B. in his defense. He offered the testimony of his mother and other witnesses to establish that he would not have been able to commit the acts of sexual abuse in question without being seen, given his mother's rules regarding the children and the relatively small quarters in which the children were tended. She corroborated S.M.B.'s claims about the incidents where he nudged M.P. out of his way and when he tripped over K.M.

{¶ 32} J.B. testified that she runs a daycare center out of her home. According to J.B., her home is very small, and she described the layout of the home with the aid of a floor plan. J.B. testified there were as many as seven small children, including infants, under her care in March and April 2014. J.B. testified the children are with her in the home roughly ten hours per day, five days per week. J.B. stated she has a number of rules surrounding the children's care that are never to be broken. For example, she does not allow the children to go into the hallway or the bedrooms unless she places them there. According to J.B., when any child is sleeping in S.M.B.'s room, S.M.B. is not allowed in. On cross-examination, however, J.B. admitted that the inside of S.M.B.'s bedroom cannot be viewed either from the living room, kitchen, or bathroom.

### 4. Manifest Weight Analysis

{¶ 33} S.M.B. concedes the evidence presented by the state, if believed, is sufficient to support the juvenile court's determination that S.M.B. is delinquent for committing rape, in violation of R.C. 2907.02(A)(1)(b), and gross sexual imposition, in violation of R.C. 2907.05(A)(4). S.M.B. argues, however, that the absence of any corroborating physical evidence of sexual abuse, inconsistencies in the victims' accounts of the alleged sexual abuse, and the testimony of S.M.B. and J.B. required acquittal of the charges. We disagree.

{¶ 34} In our view, the absence of corroborating physical evidence to support M.P.'s claim of sexual abuse is of little consequence in this case given the type of abuse alleged and the time between occurrence and M.P.'s physical examination at Children's.[2] Under the circumstances, it would have been surprising if any physical evidence were found on M.P.'s person or clothing. Moreover, Dr. Lloyd testified a normal medical examination does not rule out sexual abuse.

---

[2] We note the examination did reveal the presence of a Y-chromosome DNA profile on M.P.'s underwear, but it could not be matched to any particular person. (State's Ex. O.)

{¶ 35} Similarly, the alleged inconsistencies in M.P.'s accounts of the incidents do not render the finding of delinquency against the manifest weight of the evidence. S.M.B. contends that M.P. was not to be believed because she gave additional details about the sexual abuse to hospital personnel that she had not given to her mother. For example, M.P. told Soltes that sexual abuse occurred in the hallway and that other children could have seen it, but she did not give those details to her mother. She also told Soltes about the oral sex but did not mention this to her mother.

{¶ 36} In our view, the additional details M.P. provided to Soltes are not necessarily inconsistent with the story she told her mother as one would expect a trained forensic examiner, such as Soltes, to uncover greater detail from a victim of sexual abuse than a lay person. Nor do we consider it inconsistent for M.P. to tell Soltes that S.M.B. "made me suck his thingy * * * one time" but later told Soltes the sexual abuse by S.M.B. happened "a lot," because M.P. was initially speaking about a particular sexual act but was later speaking about multiple instances of sexual conduct. (July 16, 2015 Tr. at 19; July 17, 2015 Tr. at 89.) Moreover, the testimony M.P. gave in the courtroom was generally consistent with what she told Soltes at Children's.

{¶ 37} Though S.M.B.'s trial counsel was able to elicit testimony on cross-examination of M.P. that showed M.P. was confused about the time of day the abuse occurred and the weather outside on the day the abuse occurred, our review of the trial transcript reveals that counsel suggested certain incorrect response to M.P. and that M.P. obliged. The juvenile court found the alleged inconsistencies in M.P.'s victim testimony were "immaterial" to the charges. (Nov. 22, 2017 Decision at 17.) The record supports the juvenile court's assessment.

{¶ 38} To the extent S.M.B. argues the information M.P. provided to Soltes is not to be believed because Soltes breached established protocols during the interview, the juvenile court noted the relevant protocols permit "modification of the process in order to best suit the needs of both the family and child" and are "designed to be flexible so that employees can adjust to the needs of each individual situation." (Nov. 22, 2017 Decision at 7.) The juvenile court reviewed the trial transcript and the written protocols admitted into evidence. In overruling S.M.B.'s objection, the juvenile court stated: "Upon reviewing and analyzing the CAC protocol, this Court finds that there was no break in CAC Protocol as

[S.M.B.] contends.  The record does not support [S.M.B.'s] ancillary contention that the employees of Children's Hospital violated CAC protocol."  (Nov. 22, 2017 Decision at 7.) The written protocols admitted into evidence support the juvenile court's assessment.  *See* Def.'s Exs. 6 & 7.

{¶ 39} With regard to the finding of delinquency for the gross sexual imposition on K.M., S.M.B. contends the lack of physical evidence to support the allegations of sexual abuse undermined the delinquency determination.  However, Katherine Doughty, the advanced practice nurse who examined K.M. at Children's, testified she would not have expected to find any injuries to K.M.'s person or any physical evidence of sexual abuse given the nature of the sexual conduct alleged.  The magistrate found that Doughty qualified as an expert in child sexual abuse examination.  After observing K.M. while he was being interviewed by Wilkinson, speaking with K.M. and his mother, and conducting a physical examination of K.M., Doughty formed the opinion, to a reasonable degree of certainty, that K.M. had been the victim of inappropriate sexual conduct.

{¶ 40} S.M.B. also argues that Wilkinson violated established protocol when she used leading questions in asking K.M. about the sexual abuse by S.M.B. and that her breach of protocol rendered K.M.'s disclosure of sexual abuse unworthy of belief.  The videotaped interview was played to the magistrate during Wilkinson's testimony, and the relevant protocols were admitted into evidence.  The juvenile court reviewed the videotape, the trial transcript, and the written protocols admitted into evidence.  In overruling S.M.B.'s objection, the juvenile court concluded Wilkinson's use of certain leading question during her interview with K.M. was "in line with CAC guidelines" and "commonly used when dealing with young children involved in traumatic experiences."[3]  (Nov. 22, 2017 Decision at 10.)

---

[3] Defendant's Exhibit 7 at pages 1-3, entitled CAC Guidelines on the Medical Forensic Interview, provides, in relevant part, as follows:

> **Conducting the Interview:**
> *Interviews are conducted in a way to allow children to provide as much free narrative information as possible; however, questions are modified to reflect variables such as: age, developmental level, and emotional trauma.*
>
> * * *
>
> **Transition to Topic of Concern:**

{¶ 41} Our review of the relevant evidence reveals that Wilkinson introduced the topic of possible contact with S.M.B. by asking: "I heard something happened with [S.M.B.]." (July 22, 2015 Tr. at 158.)  However, in our view, Wilkinson's questioning of K.M. merely invited K.M. to reveal anything that may have happened with S.M.B. but did not suggest a particular response. *See State v. Moore*, 2d Dist. No. 2018-CA-14, 2019-Ohio-1671, ¶ 52 ("We have recognized that a question calling for a 'yes' or 'no' answer but not suggesting the answer is not leading.").  The videotape reveals that a majority of the questions put to K.M. were not leading.  In many instances, Wilkinson simply repeated the information K.M. had provided in a previous response and asked K.M. to explain.  Because the majority of Wilkinson's questions of K.M. were not leading, the record supports the juvenile court's determination that Wilkinson did not violate established protocol during the interview with K.M. and that K.M.'s statement had a sufficient indicia of reliability to be considered in determining whether S.M.B. was delinquent for committing gross sexual imposition.

{¶ 42} S.M.B. next contends the videotaped interview reveals that K.M. gave inconsistent and contradictory responses when asked if anyone had touched his penis.  We agree that K.M. initially answered "no" when asked if anyone other than his parents and his

---

There are a variety of techniques that may be used to introduce the topic of concern or potential abuse.  During this process the interviewer is flexible and will often take cues from the child.  The interviewer introduces the topic of suspected abuse by being as open-ended and non-suggestive as possible asking such prompts as "Tell me why you're here today," or "Tell me why you came to the doctor".  *At times the interviewer will ask more direct prompts "Did something happen to your body that would be important for the doctor to know" or "What did [name] tell you about coming to the doctor today".  Ideally these prompts are non-leading or suggestive however with younger children more direct prompts may be needed.*

* * *

Abuse Scenario (if applicable):
The interviewer allows the child to tell details of their abuse experience using open and substantive questions.  Interviewers will use open-ended questions whenever possible to invite more complete narrative responses from recall memory and to elicit the most accurate information.  *Interviewers may use more focused questions depending on the age/developmental level of the child but whenever possible the interviewer will "pair" these questions by following them up with an open-ended prompt.*

(Emphasis added.)

sister touched his penis. However, when speaking about S.M.B., K.M. gave a somewhat detailed description of the sexual contact. In our view, resolving the inconsistency in K.M.'s statements to Wilkinson was within the purview of the trier of fact. On this record, we cannot say the magistrate and the juvenile court erred in resolving the conflict.

{¶ 43} Finally, S.M.B. argues that in finding S.M.B. delinquent for committing the rape of victim M.P. and committing gross sexual imposition on victim K.M., the juvenile court erred by not properly crediting the testimony of witnesses presented by the defense. We disagree.

{¶ 44} The determination of weight and credibility of the evidence is for the trier of fact. *In re A.W.*, 2009-Ohio-5093, at ¶ 4, quoting *In re M.T.*, 2006-Ohio-3613, at ¶ 8-9. The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. *In re A.W.* at ¶ 4. The trier of fact is free to believe or disbelieve all or any of the testimony. *Id.* The magistrate believed the testimony of the state's witness and assigned greater weight to their testimony. Neither the magistrate nor the juvenile court found the testimony of S.M.B. and his witnesses to be persuasive.

{¶ 45} Our review of the record shows that even though the testimony of S.M.B. and his witnesses shows that S.M.B. did not have unfettered access to the victims, the testimony does not support a finding that S.M.B. did not have sufficient access to the victims to commit the crimes in question. S.M.B. admitted he did have contact with both victims during the relevant time period, even though he claims the contact was innocent. Similarly, while the relatively small size of J.B.'s home shows that it would be difficult for the sexual abuse of the two victims to go undetected, the magistrate and the juvenile court were not persuaded by J.B.'s claim that the abuse did not happen because she did not witness it. On this record, we cannot say the juvenile court lost its way in resolving the conflicts in the evidence and reaching the conclusion that S.M.B. was delinquent for committing the offense of rape against victim M.P. and gross sexual imposition against victim K.M.

{¶ 46} Accordingly, we hold the juvenile court judgment declaring S.M.B. delinquent for committing the offenses of rape and gross sexual imposition is not against the manifest weight of the evidence. S.M.B.'s fifth assignment of error is overruled.

### B.  S.M.B.'s First Assignment of Error

{¶ 47} In S.M.B.'s first assignment of error, S.M.B. contends the trial court erred when it ruled the six-year-old victim, M.P., was competent to testify as a witness in this matter.  We disagree.

{¶ 48} A determination of competency is within the sound discretion of the trial court and will not be reversed on appeal absent a clear abuse of discretion.  *State v. Frazier*, 61 Ohio St.3d 247, 251 (1991).  " 'The term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable * * *.' "  *State v. Moreland*, 50 Ohio St.3d 58, 61 (1990), quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶ 49} Evid.R. 601 provides: "Every person is competent to be a witness except: (A) * * * children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." Accordingly, "a witness under the age of ten is not presumed incompetent, but rather, the proponent of the witness's testimony bears the burden of proving that the witness is capable of receiving just impressions and relating them truthfully."  *State v. Clark*, 71 Ohio St.3d 466, 469 (1994).  "A trial court must conduct a voir dire examination of a child under ten years of age to determine the child's competence to testify."  *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 100.  In making this determination, the court must consider the following factors:

> (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful.

*Id.*, quoting *Frazier* at 251.

{¶ 50} Prior to trial, the magistrate held an evidentiary hearing for the purpose of determining the competency of the two proposed witnesses for the prosecution who were under the age of ten, M.P., who was then six years old, and K.M., who was five years old. The magistrate found M.P. competent to testify as a witness in this matter but not K.M.  The juvenile court overruled S.M.B.'s objection to the magistrate's competency determination as to M.P.

{¶ 51} The transcript of the competency hearing reveals M.P. was able to provide the magistrate with her first, middle, and last name and her age. She could not remember the year she was born but she knew the day and month. M.P. told the magistrate she lived with her mom, C.P., her dog, and two bunnies. According to M.P., her dog is a girl named Roxy. Roxy is a "Chow mix." (July 7, 2015 Tr. at 6.) When the magistrate asked about M.P.'s bunnies, M.P. told her that Cotton is the baby, and "[w]e call her cotton ball sometimes." (July 7, 2015 Tr. at 6.) She stated the other bunny is named Thumper.

{¶ 52} The magistrate asked M.P. about a stuffed animal she had with her, and M.P. answered its name is "Bear." (July 7, 2015 Tr. at 7.) M.P. told the magistrate that Bear is purple in color. The magistrate followed up by asking: "If I told you bear was yellow, would that be true or not true?" (July 7, 2015 Tr. at 8.) M.P. initially responded "[t]rue" but then said "[n]o." (July 7, 2015 Tr. at 8.) The magistrate then asked M.P. "[w]hat would it be if I told you bear was yellow," and M.P. responded "[i]t would be no." (July 7, 2015 Tr. at 8.)

{¶ 53} M.P. responded "[y]es, I'm in first grade" when the magistrate asked her "[d]o you go to school?" (July 7, 2015 Tr. at 8.) M.P. could not recall her first grade teacher's name but knew her kindergarten teacher's name was "Miss Kay." (July 7, 2015 Tr. at 8.) When the magistrate asked M.P. if she has already started first grade, she said "[n]ot yet." (July 7, 2015 Tr. at 9.) M.P. stated she would start first grade "[i]n the fall." (July 7, 2015 Tr. at 9.) When the magistrate asked M.P. if she knew what day of the week it was she said "Friday," which was incorrect. (July 7, 2015 Tr. at 9.) She also responded that the current month was "[s]pring." (July 7, 2015 Tr. at 9.) M.P. testified that at Christmas time her family put up a Christmas tree and that the weather was snowy. The magistrate did remind M.P. to take her hands away from her face when she spoke and to always answer out loud. M.P. also admitted she was "scared." (July 16, 2015 Tr. at 11.)

{¶ 54} When the magistrate asked M.P. if she had learned to count, M.P. began counting out loud to 25. The magistrate told M.P. "[i]t sounds like you could kinda (sic) count to a thousand if you wanted to, doesn't it," and she responded "I don't know how." (July 7, 2015 Tr. at 10-11.) M.P. denied ever telling her mother a lie and added "I don't tell lies." (July 7, 2015 Tr. at 11.) When asked by the magistrate whether her mother ever told her what would happen if she told lies, M.P. responded "[y]es" and then added "I'd have to go to the doctor, maybe." (July 7, 2015 Tr. at 11.) When asked if she was ever told of any

other consequence if she told her mom "a fib or a lie," M.P. stated "I don't know." (July 7, 2015 Tr. at 11-12.)

{¶ 55} When the magistrate asked M.P. why she was in the courtroom, the following exchange took place:

> MAGISTRATE VAN DYKE: * * * And do you know why you're here today in court?
>
> [M.P.]: (non-verbal response).
>
> MAGISTRATE VAN DYKE: And—you're here to tell the—to tell us about something that happened, right?
>
> [M.P.]: (non-verbal response).
>
> MAGISTRATE VAN DYKE: Tell me, do you understand—you just look up here right now—do you understand how very, very important it is for you to be sure that you tell me, the Court and everybody here exactly what happened and to tell the truth about what happened?
>
> TONI AVENA: Speak out.[4]
>
> [M.P.]: Yes.
>
> MAGISTRATE VAN DYKE: And do you promise that if you're asked questions by these lawyers—see all these people in suits?
>
> [M.P.]: (non-verbal response).
>
> MAGISTRATE VAN DYKE: Okay, they're the lawyers and you know they have different jobs, but do you promise that you will tell—that you will answer their questions and that you promise to tell them the truth, exactly how things happened.
>
> [M.P.]: (non-verbal response).
>
> MAGISTRATE VAN DYKE: You're shaking your head, but I need you to—
>
> TONI AVENA: You have to speak out.
>
> [M.P.]: Yes.
>
> * * *
>
> MAGISTRATE VAN DYKE: [M.P.], if I told you that—do you remember the prosecutor over here? Do you remember Ms. Julian?
>
> [M.P.]: Uh-huh (affirmative response).

_____

[4] Toni Avena is the representative of the Franklin County Prosecutor's Office who was assigned the task of escorting M.P. while she was in the courthouse.

MAGISTRATE VAN DYKE:  If I told you that her suit —

[M.P.]:  Uh-huh (affirmative response).

MAGISTRATE VAN DYKE:  — that she's wearing today was white, would that be a truth or a lie?

[M.P.]:  A lie.

MAGISTRATE VAN DYKE:  A lie?  And if your mom asked you a very important question—because that wasn't—that wasn't a big, important question, was it?  That was kinda (sic) just a little joke question, but you knew the answer to that.  But if your mom asked you a very, very important question, and you did not tell her the truth about that question, tell me what you think would happen?

[M.P.]:  I would get my butt spanked.

* * *

MAGISTRATE VAN DYKE:  You'd get spanked.  And do you understand that—do you believe it's wrong if you were to tell your mama (sic) a lie about something?

[M.P.]:  It's wrong.

MAGISTRATE VAN DYKE:  And you're saying yes, you do?

[M.P.]:  It's wrong.

MAGISTRATE VAN DYKE:  Okay.  If you were to be playing with a—a playmate—let's say you were playing with your doggie, and maybe the doggie wasn't paying enough attention to you, and you hit your doggie and mom asks you about that—

[M.P.]:  I'd say—

MAGISTRATE VAN DYKE: — and if you know you were going to get in trouble if you didn't tell the truth, tell me would you would do?

* * *

[M.P.]:  — I would tell the truth.

MAGISTRATE VAN DYKE:  Okay.  But what would happen, do you think, if you told mom "no, I didn't really hit the dog, the dog just yelped because I didn't really hit the dog"?

[M.P.]:  She would send me to my room.

MAGISTRATE VAN DYKE:  Okay.  And do you understand that in court, if you didn't tell the truth about something, that a lot worse things could happen, not to you, but to somebody else if you didn't tell the truth; do you understand that?

[M.P.]: (non-verbal response).

TONI AVENA: Speak out.

MAGISTRATE VAN DYKE: Do * * * you understand that something very bad could happen if you don't tell the truth about everything?

[M.P.]: Yes.

(July 7, 2015 Tr. at 12-16.)

{¶ 56} Following this exchange, S.M.B.'s trial counsel examined M.P., and she answered "[y]es" when asked if it would be a lie if she told her mom something that was not true. (July 7, 2015 Tr. at 17.) He also asked her if she knew who she was talking to that day and she said "[t]he Judge (sic)." (July 7, 2015 Tr. at 18.) Counsel asked M.P. what the judge's job was and she answered "[t]o know the truth," which the judge would know "by people telling the Judge." (July 7, 2015 Tr. at 18.) When counsel asked M.P. why it was important to tell the judge the truth, she said "[b]ecause you can't lie." (July 7, 2015 Tr. at 18.) As S.M.B.'s counsel continued, the following occurred:

ATTORNEY LISTON: * * * Do you know what happens if you lie in the courtroom?

[M.P.]: You get sent to jail.

ATTORNEY LISTON: You can go to jail? Did your mommy teach you that?

[M.P.]: (non-verbal response).

ATTORNEY LISTON: Did Ms. Avena teach you that?

[M.P.]: She did.

(July 7, 2015 Tr. at 18-19.)

{¶ 57} S.M.B. argues the transcript of the competency hearing shows M.P. is not able to receive accurate impressions of facts and observations, does not have the ability to recollect factual impressions and observations, and cannot communicate what she has observed. S.M.B. also claims the juvenile court employed the incorrect standard in reviewing the magistrate's competency determination. We disagree.

{¶ 58} Here, the trial court conducted an examination of the victim to determine her competency to testify. During the examination, the victim stated her full name, the name of her kindergarten teacher, the people she lived with, and the names of her pets. M.P. counted to 25, but when the magistrate offered that M.P. could count to 1,000, she admitted

she did not know how. She also understood who the judge was, and she knew the judge's function was to determine the truth. M.P. also demonstrated she knew when something was not true by responding "[n]o" when the magistrate told her that her bear was yellow. (July 7, 2015 Tr. at 8.) M.P. indicated she understood that she got in trouble when she did not tell the truth and promised to tell the truth when answering questions from the lawyers. In our view, the record shows M.P. was able to receive accurate impressions of facts and observations, had the ability to recollect factual impressions and observations, and could communicate what she has observed.

{¶ 59} Nevertheless, S.M.B. contends that certain inaccurate responses to questions asked of M.P. at the competency hearing required the juvenile court to find M.P. not competent. For example, S.M.B. cites M.P.'s mistake about the day of the week and the month of the year as evidence of her incompetence. S.M.B. also points to her initial incorrect response when the magistrate asked her if her bear was yellow as evidence of M.P.'s incompetence as a witness, even though M.P. corrected her incorrect response without prompting.

{¶ 60} In *State v. Ferguson*, 10th Dist. No. 07AP-999, 2008-Ohio-6677, this court affirmed the trial court's determination that a six-year-old sexual abuse victim was competent to testify at trial. This court noted that merely providing incorrect answers to questions does not render a child witness incompetent. *Id.* at ¶ 29, citing *State v. Anderson*, 154 Ohio App.3d 789, 2003-Ohio-5439, ¶ 62 (7th Dist.). Rather, courts must examine the magnitude of the error in assessing competence. *Ferguson* at ¶ 29, citing *State v. Jett*, 11th Dist. No. 97-P-0023 (Mar. 31, 1998). Serious errors in a child's testimony regarding important details of the crime weigh heavily against a finding of competence. *Ferguson* at ¶ 29.

{¶ 61} Here, the incorrect answers provided by M.P. at the competency hearing do not concern facts related to the crimes at issue. Thus, the errors in M.P.'s testimony are not of a magnitude that would require a finding of incompetency under the relevant case law. Moreover, as noted above, M.P. corrected herself when she incorrectly answered that her bear was yellow. *See Ferguson* at ¶ 26 (in finding the trial court did not err when it declared child victim competent, this court noted that child victim corrected an earlier statement that his favorite cartoon character was real).

{¶ 62} S.M.B. also cites alleged inconsistencies between the statements M.P. made to others about certain facts attendant to the sexual abuse and her trial testimony as evidencing her incompetence. For example, S.M.B. cites the fact that M.P. told Soltes that S.M.B. abused her in the hallway with K.M. and another child in the home, but she did not include those details in her testimony at the competency hearing. S.M.B. also points to the fact that M.P. told Soltes that S.M.B. took photographs of her without clothing several times but did not mention this in her trial testimony. We do not necessarily view M.P.'s accounts of the sexual abuse as inconsistent. Rather, M.P. merely related additional details to Soltes, a trained forensic examiner, that she did not tell her mother or did not provide during her in-court testimony. Moreover, our review of M.P.'s testimony during the competency hearing, her statements to others, and her testimony at trial reveals that M.P. provided a consistent account of the material allegations of sexual abuse. Thus, the record shows that M.P. was able to recollect accurate impressions of the alleged sexual abuse.

{¶ 63} S.M.B. claims that M.P.'s incompetence is evidence by her response that she would "maybe" have to go to the doctor if she told a lie. (July 7, 2015 Tr. at 11.) In *Ferguson*, the fact that the child witness was unable to define the words "truth" and "lie" was not as important to the competency determination as the witness's recognition that telling the truth is good and that telling a lie is bad. *Id.* at ¶ 25. Here, M.P.'s testimony that she would "maybe" go to the doctor if she told a lie, though inaccurate, evidences M.P.'s awareness that there are negative consequences for telling a lie. As this court noted in *Ferguson*, " '[t]he crucial inquiry is the morality of speaking truthfully.' " *Id.* at ¶ 25, quoting *State v. Kirk*, 42 Ohio App.3d 93, 94 (5th Dist.1987). *See also Maxwell*, 2014-Ohio-1019, at ¶ 104 (the record supported the trial court's finding that a five-year-old witness understood the importance of telling the truth and was competent to testify, where the child had responded "[y]ou will get in trouble" when asked: "What happens if you tell a lie?"); *Ferguson* at ¶ 25 (child witness who answered "[p]eople be taking you to college" when asked about the consequences of lying was not incompetent where the record demonstrates "he appreciates the responsibility to be truthful"). Moreover, on cross-examination by S.M.B.'s counsel at the competency hearing, M.P. stated "[y]ou get sent to jail" if you tell a lie in the courtroom. (July 7, 2015 Tr. at 18.) In our view, the record supports the juvenile court's determination

that M.P. had an understanding of truth and falsity and appreciated her responsibility to be truthful.

{¶ 64} Finally, S.M.B. argues the juvenile court failed to conduct a de novo review in ruling on S.M.B.'s objection to the magistrate's competency determination. The juvenile court's decision provides in relevant part:

> The determination of competency is within the sound discretion of the trial judge. *State v. Frazier*, 61 Ohio St.3d 247, 251, 574 N.E.2d 483 (1991). The trial judge has the opportunity to observe the child's appearance, his or her manner of responding to the questions, general demeanor and any indicia of ability to relate the facts accurately and truthfully. *Id.* Nothing in the transcript associated with the instant matter indicated that the Magistrate abused her discretion *or made an error* by finding [M.P.] competent to testify. Consequently, the adjudicated delinquent minor's first objection is not well taken.

(Emphasis added.) (Nov. 22, 2017 Decision at 4.)

{¶ 65} We do not read the juvenile court's decision as an abandonment of the de novo standard of review. Rather, the juvenile court merely acknowledged the fact that the magistrate who presided over the competency hearing was in a better position to evaluate the witness because she had the opportunity to observe the witness as she testified, whereas the juvenile court's review was confined to the transcript. *Clark*, 71 Ohio St.3d at 469. The juvenile court reviewed the hearing transcript and applied the relevant law in determining the magistrate did not err in finding M.P. competent to testify. Thus, the juvenile court applied the correct standard in reviewing the magistrate's competency ruling. On this record, we cannot say the juvenile court abused its discretion in finding M.P. competent to testify as a witness in this matter.

{¶ 66} For the foregoing reasons, S.M.B.'s first assignment of error is overruled.

## C. S.M.B.'s Second Assignment of Error

{¶ 67} In S.M.B.'s second assignment of error, S.M.B. argues the juvenile court erred when it permitted M.P. to testify without having been administered an oath or affirmation declaring she would testify truthfully with an understanding of the penalties for not testifying truthfully. We disagree.

{¶ 68} Appellee argues that we should review S.M.B.'s second assignment of error under the plain error standard because S.M.B. failed to object to the absence or

insufficiency of the oath when M.P. took the stand.  S.M.B. counters that even though S.M.B.'s trial counsel did not interpose an objection when M.P. took the stand, S.M.B.'s pre-testimonial objection to M.P.'s competency and post-testimonial objections to the magistrate's decision adequately preserved the issue.  We find the oath was sufficient even under the less deferential standard.

{¶ 69}  Evid.R. 603 requires that "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so."  There is no particular formula required for administration of an oath.  *Frazier*, 61 Ohio St.3d at 251.  *See also State v. Vento*, 5th Dist. No. 2017 AP 03 0006, 2018-Ohio-1799, ¶ 22.  "The staff notes for Evid.R. 603 indicate the rule affords flexibility when dealing with a child witness."  *Id.*

{¶ 70}  Here, the trial transcript reveals the following exchange before M.P. took the stand to testify:

> MAGISTRATE VAN DYKE:  [M.P.], do you remember being in here a few days ago?
>
> [M.P.]:  Yeah.
>
> MAGISTRATE VAN DYKE:  Yeah.  And do you remember I asked you some questions about whether you knew the difference between telling the truth and telling a lie.  Do you remember that?
>
> [M.P.]:  Yeah.
>
> MAGISTRATE VAN DYKE:  And I want to make sure that you remember today that your job in here is to make sure that you tell the truth because we've got two lawyers here who are going to be asking you questions.  You know Ms. Julian – or Ms. Chris (sic), I don't know what you call her, but she's going to ask you questions first and then – Mr. Liston, are you going to be the one to cross or is –
>
> ATTORNEY LISTON:  It'll be me, Your Honor.
>
> MAGISTRATE VAN DYKE:  Okay.  And then Mr. Liston – after she asks questions, Mr. Liston will get to ask you questions.  So I want you to promise me today that you will give a very truthful answer to any questions that either of the attorneys ask you.  Can you do that?
>
> [M.P.]:  Yeah.

(July 16, 2015 Tr. at 4.)

{¶ 71} S.M.B. argues the magistrate's failure to specifically advise M.P. of the penalties for perjury rendered the oath "meaningless." (S.M.B.'s Brief at 46.) We disagree.

{¶ 72} M.P.'s testimony at the competency hearing demonstrated that M.P. knew the difference between the truth and a lie, and she knew there were consequences for failing to tell the truth in court, including the possibility of being sent to jail. Though S.M.B. asks this court to disregard M.P.'s statement about going to jail because M.P. admitted she was given that information by Toni Avena, the record establishes M.P. was aware of the consequences for lying in court, and she promised the magistrate she would tell the truth. Thus, the record shows that the oath in this case, though imperfect, was administered to M.P. in a form calculated to awaken her conscience and impress on M.P. her duty to tell the truth. Accordingly, on this record, even if we were to apply the abuse of discretion standard rather than the plain error standard, the result would be the same as the record shows the magistrate administered an oath sufficient for the magistrate to make a determination that M.P. would testify truthfully with the understanding of the penalties for not doing so. Accordingly, S.M.B.'s second assignment of error is overruled.

### D. S.M.B.'s Third Assignment of Error

{¶ 73} In S.M.B.'s third assignment of error, S.M.B. argues the trial court erred when it admitted the hearsay statements of the two victims in this case under the excited utterance hearsay exception in Evid.R. 803(2). More particularly, S.M.B. contends the exception did not apply to the out-of-court statements M.P. made to her mother, C.P., and those K.M. made to his mother, M.M. S.M.B. has not challenged, on hearsay grounds, the admission of the out-of-court statements M.P. made to Soltes or those K.M. made to Wilkinson.

#### 1. Victim M.P.

{¶ 74} Evid.R. 803 provides that "[t]he following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: * * * (2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The Supreme Court of Ohio in *State v. Taylor*, 66 Ohio St.3d 295, 300 (1993), explained the justification for this hearsay exception:

> Reactive excited statements are considered more trustworthy than hearsay generally on the dual grounds that, first, the stimulus renders the declarant incapable of fabrication and, second, the impression on the declarant's memory at the time of the statement is still fresh and intense. Accordingly, Rule 803(2) assumes that excited utterances are not flawed by lapses of memory or risks of insincerity.

*Id.*, citing 1 Weissenberger's *Ohio Evidence*, Section 803.16 (1992).

{¶ 75} "[T]he excited-utterance exception is essentially a codification of Ohio common law governing spontaneous exclamations." *State v. Wallace*, 37 Ohio St.3d 87, 89 (1988). "While courts are reluctant to find a statement to be an 'excited utterance' when a long period of time has elapsed between the event and the statement, '[t]here is no *per se* amount of time after which a statement can no longer be considered to be an excited utterance.' " (Emphasis sic.) *State v. Wampler*, 6th Dist. No. L-15-1025, 2016-Ohio-4756, ¶ 34, quoting *Taylor* at 303; *State v. Duncan*, 53 Ohio St.2d 215, 220 (1978). In this vein, the Supreme Court "has upheld the admission of statements made by children who were sexually assaulted even after a substantial lapse of time." *Wampler* at ¶ 34. The rationale for doing so is the recognition that " 'children are likely to remain in a state of nervous excitement longer than would an adult' " and that young children possess " 'limited reflective powers.' " *Id.*, quoting *Taylor* at 304. It is "[t]he '[i]nability to fully reflect [that] makes it likely that the statements are trustworthy.' " *Wampler* at ¶ 34, quoting *Taylor* at 304. Accordingly, the Supreme Court has determined "the excited utterance exception to the hearsay rule should be applied liberally in a case involving the sexual abuse of a young child." *Moore*, 2019-Ohio-1671, at ¶ 38, citing *State v. Boston*, 46 Ohio St.3d 108, 118 (1989), *overruled in part on other grounds* in *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267. This approach is necessary due to "the age of the child, the shocking nature of the act, and the surprising nature of the assault." *Moore* at ¶ 38.

{¶ 76} A hearsay statement is not, however, admissible under the excited utterance exception in Evid.R. 803(2) where testimony shows that the response was not a spontaneous excited utterance but a considered answer in response to questions. *Wallace*. Accordingly, in *Wallace*, the Supreme Court cautioned that admission of a declaration as an excited utterance is permitted where the statements were made in response to questioning that: (1) is neither coercive nor leading; (2) facilitates the declarant's

expression of what is already the natural focus of the declarant's thoughts; and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties. *Id.* at 93.

{¶ 77} Here, the testimony shows M.P.'s statement to her mother that "[S.M.B.] has secrets" was spontaneously uttered by M.P. while her and her mother were watching a movie. (July 16, 2015 Tr. at 53.) Though C.P. stated that M.P. was initially calm when she uttered the statement, M.P. made the statement spontaneously and out of any recognizable context. What followed was C.P. asking M.P. what she meant, to which M.P. responded she "wasn't supposed to tell." (July 16, 2015 Tr. at 53-54.) C.P. testified she told her daughter: "you don't keep secrets from mommy. You tell mommy." (July 16, 2015 Tr. at 54.) M.P. testified that M.P. then told her "[S.M.B.] touches her butt," which her mother understood to mean M.P.'s vagina. (July 16, 2015 Tr. at 54.) M.P. then pointed between her legs when C.P. asked her where on her body S.M.B. touched her. When C.P. asked M.P. if her clothes were on or off when S.M.B. touched her butt, M.P. stated that her clothes were off. C.P. told the magistrate that M.P. became "nervous" on disclosing the sexual abuse. (July 16, 2015 Tr. at 52.) C.P. also told the magistrate that "maybe a month or two before" M.P.'s disclosure, she was having "a lot of difficulty sleeping. * * * She was soiling her pants; having accidents when she didn't really do that. She was more clingy. She would cry." (July 16, 2015 Tr. at 73, 74.)

{¶ 78} " 'A reviewing court should give the trial court wide discretion when the trial court decides that statements made by a child-victim about sexually abusive acts qualify as excited utterances.' " *State v. Robinson*, 12th Dist. No. CA2015-01-013, 2015-Ohio-4533, ¶ 29, quoting *State v. Ashcraft*, 12th Dist. No. CA97-11-217 (Sept. 28, 1998), citing *State v. Wagner*, 30 Ohio App.3d 261, 263 (8th Dist.1986). The decision of the trial judge determining whether or not a declaration should be admissible under the excited utterance exception to the hearsay rule should be sustained where such decision appears to be a reasonable one, even though the reviewing court, if sitting as a trial court, would have made a different decision. *State v. Ames*, 12th Dist. No. CA2000-02-024 (June 11, 2001), citing *Potter v. Baker*, 162 Ohio St. 488, 500 (1955) (decided under common law). "[W]hen the crime is rape, determining whether the victim is in an excited state is a factual question that

is left to the trial court's discretion."  *Ashcraft*, citing *State v. Smith*, 34 Ohio App.3d 180, 190 (5th Dist.1986).

{¶ 79}  Here, the record shows that M.P.'s statements about the sexual abuse were in response to questioning by her mother that was neither coercive nor leading.  C.P. simply asked M.P. an open-ended question allowing M.P. to explain what she meant by her statement "[S.M.B.] has secrets."  (July 16, 2015 Tr. at 53.)  M.P.'s revelations that followed can fairly be described as M.P.'s expression of what was the natural focus of her thoughts.  *Wallace* at 93.  Because C.P. could not have known the subject of M.P.'s statement, given the lack of context, her questions did not suggest a particular response.  Thus, C.P.'s questioning of M.P. merely facilitated M.P.'s expression of what was in her mind.  *Id.*  Given the liberal application of the exited utterance hearsay exception to statements made by victims of child sexual abuse, it was reasonable for the magistrate and the juvenile court to conclude that M.P. was still under a state of nervous excitement when she uttered the statement "[S.M.B.] has secrets."  (July 16, 2015 Tr. at 53.)

{¶ 80}  Furthermore, we find it reasonable for the magistrate and the juvenile court to conclude M.P. made the statements relating to sexual abuse she suffered at the hands of S.M.B. while M.P. was still under the stress of excitement caused by the abuse.  C.P.'s testimony about the sudden and disturbing changes in M.P.'s behavior "maybe a month or two" prior to M.P.'s disclosure permits an inference that the abuse occurred at that time. (July 16, 2015 Tr. at 74.)  Under similar circumstances, Ohio courts have admitted out-of-court statements from child sexual abuse victims under the excited utterance exception. *See*, *e.g.*, *State v. Kincaid*, 9th Dist. No. 94CA005942 (Oct. 18, 1995) (the court found statements of a six-year-old child to be "excited utterances" despite the fact that the statements were made months after she had been sexually abused); *Ames* (under the excited utterance exception, the court admitted testimony about statements made by the child victim approximately two months after the sexual abuse occurred); *State v. Stipek*, 7th Dist. No. 92-B-59 (Mar. 30, 1995) (trial court permitted testimony about statements made by the sixteen-year-old victim four-to-six weeks after the sexual abuse had occurred); *Wampler* (trial court did not abuse its discretion in admitting, under the excited utterance exception, out-of-court statements from a six-year-old witness of child sexual abuse even though the statements were made to police two months after the incident).  Under the

circumstances of this case, we find the juvenile court did not abuse its discretion when it admitted M.P.'s statements to her mother under the excited utterance exception to the hearsay rule.

### 2. Victim K.M.

{¶ 81} M.M. testified that in April 2014, K.M. "seemed apprehensive and scared" at the dinner table one night. (July 22, 2015 Tr. at 12.) According to M.M., her son spontaneously announced that "[S.M.B.] played with my penis and I didn't like it, and it hurt." (July 22, 2015 Tr. at 13.) M.M. recalled that she "was in utter shock, as was everyone at the table and I tried—I asked him what happened, and he said the exact same thing and I said, 'Are you sure?' and he said, 'Yes.' " (July 22, 2015 Tr. at 14.) M.M. testified that K.M. was taught to "use anatomically correct names" for body parts, and when he referred to his penis he is referring to "[h]is genitals." (July 22, 2015 Tr. at 14.)

{¶ 82} In our view, M.M.'s testimony establishes a sufficient foundation for the juvenile court to conclude that K.M.'s spontaneous and unsolicited statement at the dinner table qualifies as an excited utterance under Evid.R. 803(2). M.M.'s testimony supports a finding that K.M. was still in a state of nervous excitement from a startling event when he spontaneously exclaimed "[S.M.B.] played with my penis and I didn't like it, and it hurt." (July 22, 2015 Tr. at 13.) Under the circumstances, it was reasonable for the juvenile court to find that K.M.'s spontaneous statement was not the product of reflective thought. The record shows that K.M.'s subsequent repetition of the same statement to M.M. was in response to open-ended questions from his mother.

{¶ 83} S.M.B. argues the juvenile court abused its discretion by admitting the out-of-court statements K.M. made to his mother because there was no evidence as to the time frame in which the sexual abuse occurred and, consequently, no basis for the juvenile court to determine the length of time between the sexual abuse and K.M.'s statements. However, given the testimony that K.M. "seemed apprehensive and scared" just prior to making the statement establishes that, whenever the abuse occurred, K.M. was still in a state of nervous excitement when he made the exclamation.[5] (July 22, 2015 Tr. at 12.)

---

[5] We note S.M.B. admitted having physical contact with K.M. a few weeks before the report of sexual abuse surfaced, but, as noted earlier in this decision, S.M.B. claimed the contact was accidental.

{¶ 84} A trial court should liberally apply the excited utterance exception when the declarant is a child victim. *Wagner*, 30 Ohio App.3d at 263. Under the liberal construction of the excited utterance exception adopted by the Supreme Court, we cannot say the juvenile court acted arbitrarily or unreasonably when it ruled K.M.'s statements to his mother were admissible as an exception to the hearsay rule.

{¶ 85} For the foregoing reasons, S.M.B.'s third assignment of error is overruled.

### E.  S.M.B.'s Fourth Assignment of Error

{¶ 86} In S.M.B.'s fourth assignment of error, S.M.B. contends the juvenile court committed plain error when it admitted statements of incompetent declarants K.M. and M.P. We disagree.

{¶ 87} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "An error affects substantial rights only if it affected the outcome of the trial." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Appellate courts take " '[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 52*, quoting State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus*.

{¶ 88} As set forth in our ruling on S.M.B.'s second assignment of error, the juvenile court did not err when it determined M.P. was competent to testify as a witness in this matter. Accordingly, to the extent S.M.B.'s fourth assignment of error pertains to out-of-court statements made by M.P., S.M.B. has not demonstrated plain error with regard to M.P.'s competency at the time the out-of-court statements were made. Furthermore, in *Wallace*, the Supreme Court held the testimonial incompetence of a child declarant does not bar the admission of the child's declarations as excited utterances. *Id.*, 37 Ohio St.3d at 93-94. In *Wallace*, the court recognized the determination of legal competency of a child for trial purposes is different than a determination of admissibility of the child's hearsay statements under Evid.R. 803(4). *Id.* Competency to testify is not a condition precedent to the admissibility of that hearsay. *Id. See also State v. Said*, 71 Ohio St.3d 473 (1994), fn. 1, *reversed on other grounds* in *State v. Silverman*, 121 Ohio St.3d 581, 2009-Ohio-1576, ¶ 15. Thus, a finding that the two victims were competent at the time they made the out-of-

court statements to their mothers was not required for the admission of the statements under Evid.R. 803(4).

{¶ 89} With regard to the victims' statements to various medical and forensic examiners, S.M.B.'s assignment of error does not allege the statements of the victims at issue fail to qualify as statements made for the purpose of facilitating a medical diagnosis or treatment under the hearsay exception found in Evid.R. 803(4). S.M.B. has asserted that he "actually concedes that M.P.'s and K.M.'s statements 'arguably fell under the 803(4) exception.' " (Appellee's Brief at 57, quoting S.M.B.'s Brief at 60.)[6] Though S.M.B. filed a reply brief in this matter, the reply does not address the fourth assignment of error and does not refute appellee's assertion. Accordingly, we agree the issue has been conceded for purposes of appeal. S.M.B.'s fourth assignment of error alleges only that the victims must have been competent to testify at the time statements were made to the medical and forensic examiners in order for the hearsay exception to apply. Accordingly, we will limit our discussion to the competency issue raised by the assignment of error.

{¶ 90} In *Muttart*, 2007-Ohio-5267, the Supreme Court held that a child victim's statement made for purposes of medical diagnosis or treatment is admissible under Evid.R. 803(4), "regardless of whether a child * * * has been determined to be competent to testify pursuant to Evid.R. 601." *Id.* at ¶ 46. Statements made to a social worker for the purpose of facilitating medical treatment are also admissible under the medical exception to the hearsay rule, "even where the child has not been determined competent to testify." *In re T.L.* at ¶ 15, citing *In re I.W.*, 9th Dist. No. 07CA0056, 2008-Ohio-2492, ¶ 9, 17. Under Ohio law, the state did not need to establish the testimonial competence of the two victims in this case in order for their statements to be admitted under the hearsay exception in Evid.R. 803(4).

{¶ 91} For the foregoing reasons, we hold that the juvenile court did not plainly err when it admitted the out-of-court statements of the two victims in this case. Accordingly, S.M.B.'s fourth assignment of error is overruled.

---

[6] The child victim's statements made to social workers for the purpose of facilitating medical diagnosis or treatment are generally admissible under the medical exception to the hearsay rule in sexual abuse cases. *See* Evid.R. 803(4); *see also State v. L.E.F.*, 10th Dist. No. 13AP-1042, 2014-Ohio-4585, ¶ 12; *In re T.L.*, 9th Dist. No. 09CA0018-M, 2011-Ohio-4709, ¶ 15.

## V. CONCLUSION

{¶ 92} Having overruled S.M.B.'s five assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BEATTY BLUNT, J., concurs
NELSON, J., concurs in part and dissents in part.

NELSON, J., concurring in part and dissenting in part.

{¶ 93} I join in the judgment of the court with regard to the Count 2 adjudication pertaining to victim M.P., who testified at the proceedings before the magistrate. But I respectfully dissent from the court's judgment with regard to Count 3, the count for gross sexual imposition involving K.M., who was found not competent to testify. That count was supported by a statement made by three-year-old K.M. to his mother (although apparently not credited by her for a couple weeks until after she learned of other allegations), by a subsequent "forensic interview" at the child-advocacy center in which K.M., after three times rejecting any suggestion that anyone outside of his family had touched his genitals, then provided further and inculpatory comment after having been presented with the name of the alleged delinquent juvenile, S.M.B., in the abuse context—and by no other evidence. On review it is a close matter, but I do not think that the record in its entirety when weighed as required on our review bears out a delinquency determination beyond a reasonable doubt as to Count 3.

{¶ 94} To be sure, the waters in this area of child sex abuse cases as prosecuted on hearsay evidence can be notoriously murky, and the tides shift. For example, a quarter of a century ago in *State v. Storch*, 66 Ohio St.3d 280, 291 (1993), the Supreme Court of Ohio held that while admission of hearsay pursuant to a firmly rooted hearsay exception might not violate the federal constitution's Sixth Amendment Confrontation Clause, it nevertheless "may violate our state constitutional right of confrontation" under Section 10, Article I of the Ohio Constitution. The Supreme Court now appears to have returned to the view that " 'Section 10, Article I [of the Ohio Constitution] provides no greater right of confrontation than the Sixth Amendment' " (at least as the Sixth Amendment was construed in 2010). *See State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 12, quoting

*State v. Self*, 56 Ohio St.3d 73, 79 (1990); *State v. McKelton*, 148 Ohio St.3d 161, 2016-Ohio-5735, ¶ 170, fn. 8 (same).

{¶ 95} But *Arnold* itself, while holding that certain of the statements of a four-year-old child who was unavailable to testify at trial could constitutionally be admitted consistent with the Confrontation Clause as made for the purpose of medical diagnosis and treatment, also rigorously guarded against the admission of other statements made in the same forensic interview (with regard to statements that the United States Supreme Court today perhaps might not consider "testimonial," *see, e.g., Ohio v. Clark*, 135 S.Ct. 2173, 2182 (2015) [statements "by very young children will rarely, if ever, implicate the confrontation clause"]). And the Justices in Ohio long have been frank to acknowledge the "considerable problems in devising a reasonable and workable application" of at least the treatment and diagnosis exception to the hearsay rule "in this troublesome area of the law" involving allegations of child abuse. *State v. Dever*, 64 Ohio St.3d 401, 404 (1992).

{¶ 96} Assessment of the evidence may be additionally complex here, too, because, as the court observes, counsel for S.M.B. appears to have conceded, or at least does not contest, that all of K.M.'s statements at the child-advocacy center may have been made for purposes of treatment and diagnosis (despite the interview having been scheduled at the suggestion of the police, *see* July 22, 2015 Tr. at 29-30, with a police officer in attendance, *id.* at 79, with the "multidisciplinary team" deeming the videotape "property of law enforcement," *id.* at 126, 78, and without any real understanding of the time period to which the statements may have related, or any likelihood in the context of these allegations that physical symptoms or physical medical treatment would be indicated, *see* July 27, 2015 Tr. at 47). But admissibility under that hearsay exception does not mean that these statements in context, along with the precipitating dinner table comment of K.M. admitted under a standard "applied liberally" without the normal indicia of excitement (as opposed to spontaneity) or any meaningful sense of the relevant timeframe involved, alone necessarily establish proof beyond a reasonable doubt given the balance of the record including (cross-examined) defense witness testimony.

{¶ 97} The understanding that "the live testimony of a child who has claimed abuse will in most cases enhance the reliability of the fact-finding process," *Storch*, 66 Ohio St.3d at 292, does not determine this matter, but it does to some extent inform my concerns.

*Storch* suggested some of the undercurrents that have propelled court analysis in this area, and that backdrop and the evolution of the precedents that frame or confine our task may be useful to note in acknowledging the gravity of the matter.

{¶ 98} "A very small child may not be competent to testify in open court," *Storch* began. "If such a child is abused, the child may not be able to identify his or her attacker at a trial or tell the trier of fact what happened. Unless some other form of evidence can be presented, those who abuse small children will be at liberty to do so with utter impunity. This need for admissible evidence to force those who abuse small children to face the legal consequences of the abuse pushes courts to liberalize the rules under which evidence is admitted." 66 Ohio St.3d at 284.

{¶ 99} But, *Storch* continued, "[l]iberalizing the standards for admitting evidence in trials involving allegations of child abuse is not without its risks. Not every child who says he or she has been abused has in fact been abused. * * * * [Children can become pawns, and the] innocent desire of small children to please the adults they encounter makes the problem more complicated still. * * * * Still, the fact is undeniable that child abuse, sexual or otherwise, does occur and is a monumental problem. * * * * Those who cruelly abuse children need to be punished for their cruelty and prevented from continuing or repeating their abuse. The innocent children need to be protected." *Id.* at 284-85.

{¶ 100} Thus, the Supreme Court of Ohio continued, the "burden then falls upon the courts to devise rules of evidence for child abuse cases which maximize the likelihood of convictions for the guilty and minimize the likelihood of convicting the innocent, protecting and helping those children who truly have been abused while detecting those children whose stories of abuse are not true or accurate." *Id.* at 285. To that end, the court continued, "Ohio has taken a significant step in bearing this burden through the adoption of Evid.R. 807. * * * * The rule is a conscientious attempt to balance the competing interests and increase the likelihood of just results." *Id.* at 285-86.

{¶ 101} The Supreme Court of Ohio had previously "encouraged the admission of in-court statements by the child," *Storch* went on, with appropriate admonitions as to weight; the court also had considered exceptions to the hearsay rule, including the exception for statements made for the purpose of medical diagnosis or treatment, and the Supreme Court of the United States then had "rendered subsequent opinions which appear to be partially

at odds" with what the Supreme Court of Ohio to that point had understood the federal Sixth Amendment's confrontation clause to require. *Id.* at 287. "Therefore, we must address once again the delicate balance between our concern for the welfare of victims of child abuse and justice for those who are accused of such crime. We must maintain that balance while honoring both the mandates of the Sixth Amendment to the Constitution of the United States and the mandates of our Ohio Constitution contained in Section 10, Article I." *Id.* That Ohio provision, the court stated, "is more detailed in the rights it sets forth," but does recite the right of an accused "to meet the witnesses face to face," and refers to a right "to examine the witness" in that context. *Id.* at 288.

{¶ 102} "For many years, the rights to confrontation set forth in the respective Constitutions were construed as being the same," *Storch* expostulated, "in part because the right to confrontation in the Sixth Amendment was considered by the United States Supreme Court to require face-to-face confrontation in most circumstances." *Id.* But the federal high court "has drifted away from that requirement," *Storch* opined, *id.*, to the point (in the characterization of the Supreme Court of Ohio) where "[i]f the [hearsay] statement falls within one of the well-established exceptions to the hearsay rule [such as 'spontaneous declaration' and 'medical examination' exceptions there at issue], no [federal] right to confrontation with the declarant exists," *id.* at 290, citing *White v. Illinois*, 502 U.S. 346 (1992).

{¶ 103} That is not the rule under Ohio's Constitution, *Storch* said. " '[T]he admission into evidence of a hearsay statement pursuant to a firmly rooted hearsay exception does not violate a defendant's right of confrontation' under the Sixth Amdendment as that federal right is defined by the United States Supreme Court [citing *State v. Dever*, 64 Ohio St.3d 401 (1992), at paragraph 3 of the syllabus]. However, the admission may violate our state constitutional right of confrontation." 66 Ohio St.3d at 291 (adding that "[t]he third paragraph of *Dever* should be construed to that effect"). The court continued by emphasizing that under Ohio's constitutional provision, "the circumstances under which extrajudicial statements can be admitted into evidence are few." *Id.* at 293.

{¶ 104} Although I confess to finding the *Storch* opinion somewhat elusive at that point, I think that it is most fairly read to hold, perhaps in some tension with the actual text of Evidence Rule 807 ("Hearsay Exceptions; Child Statements in Abuse Cases"), that

because "Evid.R. 807 provides the proper balance for the legitimate concerns of all whose interests the court must consider while still complying with the requirements of Section 10, Article I," compliance with that rule (as then formulated?) is required as a precondition to admission of any out-of-court statement made by a child describing abuse against him or her.  66 Ohio St.3d at 295; *see also id.* at 293 ("the trial court did not provide to Storch that which Section 10, Article I and [not then yet effective] Evid.R. 807 require").  That rule, then as now, specified among other things that such an out-of-court statement "is not excluded as hearsay under Evid.R. 802 if all of the following apply:  (1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statements at least as reliable as statements admitted pursuant to Evid.R. 803 and 804. * * * * (2) The child's testimony is not reasonably obtainable by the proponent of the statement.  (3) There is independent proof" of the sexual activity or physical harm.

{¶ 105} The Supreme Court of Ohio has cited *Storch* only once since the decision issued a quarter of a century ago, and then only to dismiss it in passing.  In *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 38, the court held that Evidence Rule 807 does *not* control the application of Evidence Rule 803(4) regarding admissibility of a child's out-of-court statements to medical personnel; "the plain text of Evid.R. 807 acknowledges that other hearsay is more reliable."  Even where a child is not himself or herself motivated by a desire to obtain medical treatment, the court said, *Dever* established that the ability of medical professionals " 'to evaluate the accuracy of statements made to them' " can provide a sufficient basis for reliability to justify admissibility.  2007-Ohio-5267, ¶ 41, quoting 64 Ohio St.3d at 411.  *Muttart* went on to hold that a child's statements may be admitted pursuant to appropriate application of Evid.R. 803(4) if made for purposes of medical diagnosis or treatment, "regardless of whether [the] child * * * has been determined to be competent."  *Id.* at ¶ 46.

{¶ 106} The defense in *Muttart* had not raised the Ohio Constitution, and the court summarized its precedents as giving a trial court discretion in appropriate cases to elect between admitting evidence under Evid.R. 803(4) or under 807, depending on the purpose of the statements after considering circumstances including "(1) whether the child was questioned in a leading or suggestive manner; (2) whether there is a motive to fabricate

* * *; and (3) whether the child understood the need to tell the physician the truth," while also looking to the age of the child, consistency of the statements, and evidence of whether proper protocols were followed. *Id.* at ¶ 48-49 (citations omitted). "Our analysis is not altered by" *Storch*, the court said (while characterizing that earlier case as having "addressed the constitutionality of Evid.R. 807 under the federal and Ohio Constitutions"), and the defense had not invoked it. 2007-Ohio-5267 at ¶ 46, fn 5.

{¶ 107} *Muttart* separately took up the federal Sixth Amendment, noting that under *Crawford v. Washington*, 541 U.S. 36 (2004), "the Confrontation Clause applies only to testimonial statements," and reciting that "[s]tatements made to medical personnel for purposes of diagnosis or treatment are not inadmissible under *Crawford*, because they are not even remotely related to the evils that the Confrontation Clause was designed to avoid." 2007-Ohio-5287, ¶ 59, 63.

{¶ 108} Two years later in *State v. Silverman*, 121 Ohio St.3d 581, 581-82, 2009-Ohio-1576, the Supreme Court of Ohio did not mention *Storch* in its 4-3 ruling that "statements of a child whose testimony is not reasonably obtainable" may be admissible under Evid.R. 807 even where the child has not been determined competent to testify. In that case, with the four-year-old victim deceased, Evid.R. 807 was satisfied because the unavailable victim's statements were unsolicited and spontaneous and uncoached, and because the defendant's "confession provided independent corroboration of the sexual acts." 2009-Ohio-1576 at ¶ 28-29.

{¶ 109} *Arnold* did not mention *Storch* either, but quoted from the pre-*Storch* case of *State v. Self*, 56 Ohio St.3d 73, 79 (1990), in reciting that " 'Section 10, Article I [of the Ohio Constitution] provides no greater right of confrontation than the Sixth Amendment.' " 2010-Ohio-2742, ¶ 12. (*Self* had involved the forcible rape of a six-year-old victim, leaving substantial physical evidence, and the cross-examined testimony by that victim through videotaped deposition.) After *Silverman*, *Arnold*, and use of the same quotation from *Self* in *McKelton* in 2016, it seems likely to me that *Storch* no longer provides authority for the proposition that Ohio's Constitution ensures greater confrontation clause rights than does the federal constitution as understood at the time of those decisions, at least with regard to "firmly rooted" hearsay exceptions. *See also State v. Williams*, 6th Dist. No. L-11-1084, 2013-Ohio-726 (subsequent jurisprudence limits *Storch*).

{¶ 110} *Arnold* took pains to describe the boundaries of permissible use of statements made to interviewers at child-advocacy centers, distinguishing between admissible "nontestimonial" statements made for purposes of medical diagnosis or treatment and inadmissible "testimonial" statements "made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose." 2010-Ohio-2742 at ¶ 2. There, in a case involving both visual observations of conduct from the time of the alleged sexual abuse and consistent physical evidence of injury "caused by acute trauma," *id.* at ¶ 3, 7, the Supreme Court of Ohio reversed a judgment affirming conviction, and remanded for this court to determine whether the improper admission of various hearsay statements had amounted to harmless error, *id.* at ¶ 44 (as we then found that it did, *State v. Arnold*, 10th Dist. No. 07AP-789, 2010-Ohio-5622).

{¶ 111} The Supreme Court in *Arnold* noted that the interviewer in a child-advocacy center frequently operates in a "dual capacity," gathering evidence for potential prosecution and also eliciting information necessary for medical diagnosis and treatment. 2010-Ohio-2742 at ¶ 33. The testimony in the present case further illuminates the interviewer's mixed-role functions. *See, e.g.,* July 22, 2015 Tr. at 126 (interviewer describes "multidisciplinary team"), 128, 133, 178 (law enforcement and nurse practitioner attend "pre-team meeting" with interviewer and then watch interview over closed circuit). *Arnold* disallowed admission of those statements obtained "to further the state's forensic investigation," including the child's description of the perpetrator's conduct apart from the actual physical abuse itself. The hearsay statement there, for example, that the rapist had removed the victim's underwear should have been excluded, along with descriptions of the perpetrator's anatomy, the account that he had locked the bedroom door before the rape, and the like; admission of those statements came in violation of the defendant's "Confrontation Clause" rights (which again the court viewed as coextensive under the federal and state constitutions). 2010-Ohio-2742 at ¶ 36, 34, 44, 12.

{¶ 112} To any extent that the federal constitution may not now be understood to bar admission of such statements as testimonial, a question probably not foreclosed by the facts or holding of *Clark*, *Arnold* arguably still maintains force under the Ohio Constitution despite the language repeated then and later from *Self* that the two provisions are entirely in parallel. *Compare, e.g., State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, ¶ 41

(admission of hearsay statements from three-year-old made during police investigation violated Sixth Amendment; declarant's young age "is not determinative of whether a testimonial statement has been made during a police interrogation").

{¶ 113} Counsel for S.M.B. here, though, while conceding that K.M's statements to the forensic interviewer "arguably fell under the 803(4) exception," Appellant's Brief at 60, focuses on the three-year-old's lack of witness competency, and does not argue any distinction between testimonial or nontestimonial statements or suggest that any particular statement be excluded on that basis. *See, e.g., id.* at 56-62. *Muttart* militates against the argument that witness competency is a necessary precondition for admission of hearsay under the medical diagnosis and treatment exception.

{¶ 114} Nor does S.M.B.'s argument on appeal outline confrontation clause arguments against the admissibility of K.M.'s dinner table statements. Rather, counsel for S.M.B. submits that K.M's "remarks to his mother did not satisfy the Evid. R. 803(2) benchmarks." Appellant's Brief at 54 (emphasis omitted).

{¶ 115} It is true, and a fact that put S.M.B. at some considerable disadvantage with regard to any timing defense, that K.M.'s dinner table statements (like his statements in response to questions from the forensic interviewer) did not—beyond the normal durational limitations that one might associate with child memories—identify any particular timeframe during which the touching was said to have occurred: K.M. had been going to the daycare for most of his young life, *see* Aug. 3, 2015 Tr. at 16 (K.M. began going there in August 2012).

{¶ 116} The majority concludes nonetheless that "K.M.'s spontaneous and unsolicited statement at the dinner table qualifies as an excited utterance under Evid.R. 803(2)." Majority Decision at ¶ 82. Importantly, the majority reaches that conclusion not simply because the statement was "spontaneous and unsolicited"—part of the analysis used by the Supreme Court of Ohio in determining that the "unsolicited and spontaneous" statement in *Silverman* was admissible under Evid.R. 807, which requires "independent corroboration of the alleged acts" that does not exist here, *see* 2009-Ohio-1576, ¶ 28-29— but because given K.M.'s demeanor as described and the substance of the statement, the mother's testimony supported a finding that "K.M. was still in a state of nervous excitement from a startling event," *see* Majority Decision at ¶ 82. The majority's conclusion is informed

by its view that "the Supreme Court has determined 'the excited utterance exception to the hearsay rule should be applied liberally in a case involving the sexual abuse of a young child,' " Majority Decision at ¶ 75, quoting *State v. Moore*, 2d Dist. No. 2018-CA-14, 2019-Ohio-1671 at ¶ 38, citing *State v. Boston*, 46 Ohio St.3d 108, 118 (1989), *overruled in part on other grounds in Muttart*; Maj. Op. at ¶ 84 (referring to "the liberal construction of the excited utterance exception adopted by the Supreme Court" and citing *State v. Wagner*, 30 Ohio App.3d 261, 263 (8th Dist. 1986).

{¶ 117} I think it worth noting that the timeframe in *Wagner* of the events or condition generating the excitement in the excited utterance was substantially more defined than it is here; there, the small child complained of current pain and injury to his rectum as then confirmed on medical examination. 30 Ohio App.3d at 261. And in *Moore*, the timeframe at issue also was specific and relatively narrow: the child witness, who did testify at trial and whose account was corroborated by physical evidence, made her excited utterance about events of "the previous night." 2019-Ohio-1671 at ¶ 35. In *Boston*, moreover, the crime traced to a visitation of only a day or two earlier, and the very young victim confided in her mother "at the earliest opportunity," 46 Ohio St.3d at 118; *see also id.* at 108; such circumstances are by no means established on the record here.

{¶ 118} *Moore* also invoked *Taylor*, in which the Supreme Court disallowed as excited utterances statements made by an adult "hours after the 'startling occurrence.' " 66 Ohio St.3d at 302. *Taylor* formulates the core of the test for excited utterances as being whether "the statement * * * even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over [the speaker's] reflective faculties, so that such domination continued to remain sufficient to make his statements * * * the unreflective and sincere expression of his actual impressions and beliefs." *Id.* at 301.

{¶ 119} *Taylor* then does note that: "In the cases of statements made by children who say they were sexually assaulted, we have upheld the admission of those statements even when made after a substantial lapse of time, but in those cases we have done so because we recognize that children are likely to remain in a state of nervous excitement longer than would an adult." *Id.* at 304, citing *Boston*, 46 Ohio St.3d at 118. And *Taylor* continues: "This trend of liberalizing the requirements for an excited utterance when

applied to young children who are the victims of sexual assault is also based on the recognition of their limited reflective powers. Inability to fully reflect makes it likely that the statements are trustworthy." *Id.,* citing *State v. Wallace*, 37 Ohio St.3d 87, 88 (1988), and *Wagner*.

{¶ 120} Here, the magistrate also had cited to *Wallace*, identifying that authority as a basis for admission of K.M.'s mother's recitation of K.M.'s statements at dinner. Sept. 1, 2015 Judgment Entry at 5. In *Wallace*, somewhat notably, the 15-hour lapse between the event there and the statement had been precipitated by the assault's having rendered the child unconscious: a "period of unconsciousness, even an extended period, does not necessarily destroy the effect of a startling event upon the mind of the declarant for the purpose of satisfying the excited utterance exception to the hearsay rule." 37 Ohio St.3d at 90.

{¶ 121} *Wallace*, like the 8th District Court of Appeal's *Wagner* opinion invoked by the majority here, cited to *State v. Duncan*, 53 Ohio St.2d 215 (1978). In that case, as in *Boston*, the statements were made at the child's "earliest opportunity" to confide in her mother, *id.* at 221: when the mother returned home from a laundromat, the child spoke immediately upon emerging from a closet, "shaking like 'an epileptic seizure,' " and her condition when then examined by a physician "several hours after the incident" further confirmed her "continuing distress and anxiety," *id.* at 217, 222. *Duncan* overturned a court of appeals decision that would have barred admission of the statement despite that context.

{¶ 122} This case, then, does not seem to me to present circumstances much analogous to those in *Wallace*, *Duncan*, *Boston*, *Taylor*, *Moore*, or *Wagner*. But *Taylor*'s reference in dicta to the "limited reflective powers" of very young children is perhaps to some extent amplified by *Muttart*'s observation that "[o]ther courts [in the context of other rules] have found that a child's young age and naivete may themselves be factors in favor of trustworthiness." 2007-Ohio-5267, ¶ 49, fn. 6; *see also, e.g., State v. Girts*, 5th Dist. No. 08-CA-31, 2009-Ohio-3422, ¶ 25 (statement more than a week after event, in case with confession; test for excited utterance in child sex abuse case is "extremely liberal" given children's " 'limited reflective powers' "); *State v. Tebelman*, 3d Dist. No. 12-09-01, 2010-Ohio-481, ¶ 29, 32 (same rationale, in case where victim testified; victim's statements occasioned by immediate physical discomfort caused by rape); *but see, e.g., State v.*

*Butcher*, 170 Ohio App.3d 52, 62-63 (11th Dist.2007) (statements made after deliberation by "upset" five- and six-year-olds "more than two months after the alleged incident" do not qualify as excited utterances). And the Supreme Court of Ohio in *Duncan* underscored that "an appellate court should allow a wide discretion in the trial court to determine whether in fact a declarant was at the time of an offered statement still under the influence of an exciting event." 53 Ohio St.2d at 219. The majority's view here that, with testimony that K.M. had "seemed apprehensive and scared" at the time of his dinner table statements, "it was reasonable for the juvenile court to find that K.M.'s spontaneous statement was not the product of reflective thought" has some force. *See* Majority Decision at ¶ 82-83.

{¶ 123} But in any event, even if I conclude that those statements were appropriately admitted as excited utterances under Evid.R. 803(2), I would not find that the manifest weight of the evidence as admitted bears out the delinquency determination for gross sexual imposition. Although that manifest weight question seems to me a close one—especially because K.M. had no apparent cause to invent what was said to be his unprompted dinner table allegation—I think that in the context of the other evidence, and putting aside (as I think for most purposes we are required to do, *see, e.g.*, Ohio Jury Instructions, CR Section 425.07(3)) the juvenile court's finding that S.M.B. was delinquent as having raped M.P., the two sets of untested hearsay statements from K.M. do not sustain the determination beyond a reasonable doubt of delinquency for gross sexual imposition under our review standard. *See, e.g., State v. Durdin*, 10th Dist. No. 14AP-249, 2014-Ohio-5759, ¶ 35 ("when presented with a manifest weight argument, we engage in a limited weighing of evidence to determine whether sufficient competent, credible evidence permits reasonable minds to find guilt beyond a reasonable doubt"); *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997) (observing, too, that " '[w]eight is not a question of mathematics, but depends on its effect *in inducing belief* ") (emphasis supplied by court).

{¶ 124} And it is of some note, perhaps, that neither the state nor the majority opinion appears to rely on any decision from the Supreme Court of Ohio or our own court upholding a criminal conviction or delinquency determination of abuse where the timing of the alleged act could not be specified and without victim testimony and based purely on hearsay evidence from others not corroborated by further direct testimony, physical

evidence, other evidence of injury, defense admissions, or evidence of any other sort.  Such adjudications may be permitted, but I think not under the circumstances here.

{¶ 125} The majority decision begins its weight assessment regarding the gross sexual imposition finding by observing that an advocacy center advanced practice nurse, "[a]fter observing K.M. while he was being interviewed by [forensic interviewer] Wilkinson, speaking with K.M. and his mother, and conducting a physical examination of K.M., * * * formed the opinion, to a reasonable degree of certainty, that K.M. had been the victim of inappropriate sexual conduct."  Majority Decision at ¶ 39.  But the nurse's "physical examination of K.M." contributed nothing to that judgment because, understandably and as expected, it revealed no indications of abuse.  *See* July 27, 2015 Tr. at 47 ("I wouldn't expect there to be an injury to begin with"), 41 ("no signs of injury or trauma"), 50 (no indication "of any kind of physical harm or trauma").  She did not interview K.M., and he seems to have imparted no particular information to her.  *Id.* at 50 ("Q: you didn't interview [K.M.] that evening, right?  A: No I did not.").  So, as she was frank to say, her opinion on whether K.M. had been abused was based entirely on the account from the forensic interview.  *Id.* at 47 ("My opinion was that there was inappropriate sexual contact that the child provided during his interview").

{¶ 126} This court itself has the transcript of that interview, as did the trial court.  I do not believe that the nurse's unadorned opinion on what K.M. told someone else adds significant weight to the state's case.  Although we do not need to conclude that the nurse's opinion was improperly admitted, that testimony at least begins to suggest the rationale for the rule that "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant."  *Boston*, 46 Ohio St.3d 108, syllabus.  *See also State v. Kincaid,* 9th Dist. No. 94CA005942, 1995 Ohio App.Lexis 4638, *8 ("error in admitting such expert testimony may be harmless beyond a reasonable doubt.  This conclusion is warranted if the victim testifies and is subject to cross examination, the state introduces substantial medical evidence of sexual abuse, and the expert's testimony is cumulative to other evidence"); *State v. Burrell*, 89 Ohio App.3d 737, 746 (9th Dist.1993) (error "[b]ased upon the admission of [Dr.] Powell's testimony that he believed that L was a victim of sexual abuse, when he conceded that the sole foundation for that belief was his assessment of her veracity").

{¶ 127} In *State v. Cashin*, 10th Dist. No. 09AP-367, 2009-Ohio-6419, ¶ 20 (citation omitted), we discussed the significance and the limits of *Boston*'s evidentiary preclusion, finding no error in the admission of a social worker's testimony "as to the substance of the statements made by [a child] during their interview [and then recounted by the social worker], and about [the child's] general demeanor, but [that] did not make any direct statement expressing any opinion about whether [the child's] statements were true. Only statements directly supporting the veracity of a child witness are prohibited under *Boston*." Here, the nurse's opinion that abuse had occurred was not presented as based on any behavior displayed by K.M. as being consistent or not inconsistent with abuse, *compare State v. Stowers*, 81 Ohio St.3d 260 (1998), or on any facts apart from the account that K.M. gave the forensic interviewer. Rather, her opinion was based on her interpretation of "the context that the child gave" to that interviewer. July 27, 2015 Tr. at 55. My point is not to protest the admissibility of the opinion, but to say that on review I do not find it to supply appreciable weight beyond the facts of the earlier forensic interview.

{¶ 128} That brings us to the forensic interview. The majority decision accurately recounts that "K.M. initially answered 'no' when asked if anyone other than his parents [that is, his mother and her boyfriend] and his sister touched his penis." Majority Decision at ¶ 42. In fact, in different ways and different contexts, K.M. responded multiple times that no one beyond those three had touched him there.

{¶ 129} Asked, "[h]as someone ever touched your penis, [K.M.]?," he responded "[y]es." July 22, 2015 Tr. at 100. He then described in some detail that his mother had touched his penis while bathing him. *Id.* at 100-02. The forensic interviewer then asked, "[s]o, has someone else touched your penis?" K.M. again responded "[y]es," and named his mother's boyfriend, again in the bathing context. *Id.* at 102; *see also id.* at 103-05 ("A: But he doesn't like my penis * * * * my penis stinks. * * * Q: [He] says your penis stinks? A: Yeah"). Then asked, "[i]s there someone else who touches your penis?" he further named his sister, again in the bathtub context. *Id.* at 105-06 (this time drawing a reaction from the forensic interviewer, who enjoined him to "[g]o tell mommy if someone ever tickles your penis"). That exhausted K.M.'s list, at that point. *Id.* at 106 ("Q: Has someone else touched your penis? * * * * A: Only -- they don't touch my penis."

{¶ 130} In response to non-leading questions, K.M. then repeatedly told the interviewer that no one else had touched his penis:

Q: Did someone else touch it, or is that it?

A: Huh?

Q: Does someone else touch your penis?

A: No.

Q: No?  Has someone ever hurt your penis?

A: Nuh-huh (negative response).

Q:  No?

A: Nuh-huh (negative response).

July 22, 2015 Tr. at 106-07.

{¶ 131} After the forensic interviewer interposed four questions that elicited the response that no one had ever touched or hurt his rear end, *id.*, the forensic interviewer herself introduced S.M.B.'s name into this conversation about people touching K.M.'s private parts. "Q: No. Okay. All right. I heard something about [S.M.B.]? I heard something happened with [S.M.B.]."  It was then that K.M. responded: "He played with my penis, [S.M.B.] did."  July 22, 2015 Tr. at 107.  The interview continued:

Q: Oh. He played with your penis? Tell me all about [S.M.B] playing with your penis.

A:  He got a tissue and -- he got a tissue and he wiped it.

Q: He got a tissue and wiped it?

A:  Uh-huh (affirmative response). * * * *

*Id.* at 107-08.

{¶ 132} The interview then proceeded, with K.M. describing that he had been sleeping in S.M.B.'s room, with others in the living room.

Q: Were you sleeping when [S.M.B.] touched your penis?

A: Yes.

Q: Or were you awake when he touched your penis or something else?

A: I was awake.* * * *

Q: Or played with it, you said?  You said he played with it, what did he do?

A: I don't know.

Q: Okay.  What was he using to play with your penis?  What did he use to play with -- with your penis?

A:  His hand.

Q: He used his hand.  Okay.  Was there something on his hand when he played with your penis?

A:  No.

Q: No.  Okay.  I thought you said something about a tissue, so I --

A:  Oh, a tissue was on him.  A tissue was on his hand.

Q:  A tissue was on his hand when he played with it?

A:  Uh-huh (affirmative response).

Q:  Okay.

A:  I'm done talking. * * * *

Q: How were your clothes when he touched your penis, like how were your pants when [S.M.B.] was touching your penis?

A:  He taked off my pants and -- and my underwear.* * * *

July 22, 2015 Tr. at 109-11.

{¶ 133} K.M. then said that S.M.B. had shut the door and left.  *Id.* at 111.  K.M. then apparently made reference to M.P.  *Id.* at 111 ("and then [M.P.]. Q: And then what? A: [M.P.] got (inaudible). Q: What happened to [M.P.]? Did you say something about [M.P.]? A:  No. Q: I --. A: I didn't say something at all.").  K.M.'s forensic interview continued, with K.M. stating that S.M.B. had woken him up with the touching.  *Id.* at 112.

{¶ 134} Whether or not the forensic interviewer's questioning comported with advocacy center guidelines—and the interviewer's insertion of S.M.B.'s name into the discussion of who had touched K.M.'s private parts went well beyond the specified guideline questions that the majority decision cites at footnote 3 above, just as surely as the guidelines themselves maintain that while "[i]deally * * * prompts are non-leading or suggestive however with younger children more direct prompts may be needed," *see* Def.'s Ex. 7 at 2— K.M. did not introduce S.M.B. into the discussion about who touched his penis until "prompt[ed]" by the forensic interviewer to do so.  *Compare* Majority Decision at ¶ 27 (forensic interviewer "acknowledged the protocols require the interviewer to remain neutral and to focus on factfinding, without suggesting answers"; July 22, 2015 Tr. at 159-

60 (protocols are meant to avoid suggesting answers or to elicit responses made to please interviewer).

{¶ 135} The characterization that the forensic interviewer's "questioning of K.M. merely invited K.M. to reveal anything that may have happened with S.M.B. but did not suggest a particular response," *see* Majority Decision at ¶ 41, may be correct as far as it goes, but does not speak to what I believe is the important context in which that questioning came: K.M. had already listed those who had touched his penis, and had not included S.M.B.; K.M. had said three times more that no one else ever had touched his penis; and it was in the immediate context of the touching of his private parts that the forensic interviewer suggested S.M.B.'s name. I acknowledge that "a majority of [the forensic interviewer's] questions put to K.M. were not leading," Majority Decision at ¶ 41, but the ones that were had some rather significant effect.

{¶ 136} As its final point on the weight of the evidence favoring this delinquency finding, the majority decision notes that "when speaking about S.M.B., K.M. gave a somewhat detailed description of the sexual contact." *Id.* at ¶ 42. That is true, even if that is precisely the sort of detail that *Arnold* might exclude as not properly admitted for reasons of medical diagnosis and treatment and as "inadmissible pursuant to the confrontation clause." *See* 2010-Ohio-2742 at ¶ 44. In this case, for the reasons noted above, the issue is not admissibility under "the bedrock procedural guarantee[s]" of the federal and Ohio Constitutions, *id.* at ¶ 12; the issue is the weight to be accorded this evidence. That weight is affected, substantially in my view, because K.M.'s responses could not be tested. Certain apparent contradictions could not be probed; other references (to M.P., for example, in the answers that K.M. then denied having made) could not be explored.

{¶ 137} K.M. was not available for cross-examination because he was found not competent to testify. That determination—made after his July competency hearing at which he had responded "[y]eah" to the magistrate's question, "[i]f you told me it's cold outside today, you think that would be the truth?", and at which when the magistrate began, "[a]nd if I told you * * * that everything you told me had to be absolutely true --" K.M. cut her off with "[n]o"—is entirely understandable. July 7, 2015 Tr. at 31, 33. But to my mind, statements made in response to the sometimes significantly leading questions of a forensic interviewer at a children's advocacy center do not necessarily carry the same weight as the

same responses would if provided in testimony subject to what *Muttart* quoting *Crawford* called " 'testing in the crucible of cross-examination,' " *see* 2007-Ohio-5267, ¶ 58.

{¶ 138} The forensic interview followed by some weeks K.M.'s dinner table statement that his mother had not believed required his immediate removal from the daycare. Again, that statement quite understandably provided no timeframe for the alleged abuse, and the speaker quite understandably could not be examined at trial. And although the magistrate found, as the reviewing courts have not, that "all testimony relating to the allegations by [K.M.]" satisfied "all aspects of Evid. Rule 807(A)," September 1, 2015 Judgment Entry at 5, there appears to be no "independent proof of the sexual activity or attempted sexual activity" as required for the operation of that rule, *see* Evid.R. 807(A)(3). Alone or in combination with the advocacy center interview conducted to follow up on the statement, I do not find that it provides enough weight in the overall context of the case for me to join in upholding the delinquency adjudication.

{¶ 139} S.M.B. did testify, too (as did his mother), and that testimony asserting innocence is in the mix as well. The state, in addressing the manifest weight issues, responds to S.M.B.'s claim that he lacked opportunity to commit the offense by arguing that "not every second of [his] time was accounted for." Appellee's Brief at 68. Given that none of the evidence apprised anyone of what day, or week, or month the assault of K.M. allegedly occurred, the fact that S.M.B. could not account for "every second" of his time (and that his defense is judged deficient on that basis) serves to highlight the nature of the case against him with regard to K.M., but hardly provides weight to the state's case.

{¶ 140} Just as this is not a case like *Wallace*, involving physical evidence and statements made immediately after the victim regained consciousness, this is not a case like *State v. Wampler*, 6th Dist. No. L-15-1025, 2016-Ohio-4756, in which all the victims testified, with at least two speaking to the attacks on their own person and one as an eyewitness to the victimization of the third. *See, e.g., id.* at ¶ 58 (reiterating the important understanding that "the testimony of a rape victim, if believed, is sufficient to support each element of rape"). I understand that no one suggests that we move from abstract case citation to citation, unmoored from the facts of precedents that are much removed from the circumstances at hand and in the process diluting the requisite level of proof. And no one suggests constructing further incentives to shield witnesses from cross-examination once

their account has been preserved by hospital personnel.  But I am concerned that the evidence adduced here offers too thin a reed to provide the weight necessary to uphold the gross sexual imposition determination as made without a defined timeframe and without evidence beyond the hearsay statements of the non-witness-competent child as generated in part by leading questions at the child advocacy center.

{¶ 141} While I concur in the judgment of the court with regard to the delinquency determination in Count 2, I respectfully dissent in this difficult case with regard to the gross sexual imposition determination (Count 3) and would remand that matter to the juvenile court.

_____